**O'DONNELL TRANSP. CO., Inc., v. TIDE-WATER IRON & STEEL CO.**

**THE FEELEY GIRLS.**

Civ. No. 10229.

United States District Court,
D. New Jersey.

March 17, 1950.

As Amended June 27, 1950.

John G. Flanigan, Jersey City, N. J., Macklin, Brown, Lenahan & Speer, New York City, Richard F. Lenahan, Martin J. McHugh, New York City, of counsel, for libellant.

Arthur J. Connelly, Newark, N. J., Enrico S. Sanfilippo, New York City, of counsel, for respondent.

MEANEY, District Judge.

The O'Donnell Transportation Co., Inc., libellant, brings this libel as owner of the barge "Feeley Girls" against the Tidewater Iron & Steel Co., respondent, to recover damages for injury to the barge allegedly caused by negligence for which respondent is responsible. The libel charges that: "After loading the lower part of the hold

with scrap iron, which did not occupy much cubic space in the hold, they then put on heavier pieces of scrap iron which caused the barge to become unwieldy. Shortly after the barge was taken in tow from respondent's dock, due to the manner in which the barge was loaded, the barge careened and finally was beached by the towing tug on October 22, 1945. As a result of the beaching of the barge, both the barge and the cargo sustained serious damage."

### Findings of Fact

1. The barge "Feeley Girls" is a wooden vessel 108 feet long, 21 feet wide, and 12 feet deep. Albert Zunner, an experienced bargman and employee of libellant, was in charge of the barge at the times material to this action.

2. Libellant undertook to ship a cargo of scrap metal to the Bethlehem Steel Corporation, at Lackawanna, N. Y., and issued a bill of lading for approximately 500 gross tons.

3. The barge was loaded at Newark by employees of the respondent. Light bulky scrap was placed in the barge first and small, heavier pieces of scrap were placed on top. The cargo was loaded approximately four feet above the coaming at the stern gradually declining to a point a little below the coaming at the bow.

4. The usual method of loading scrap was to place the heavy scrap which stowed compactly on the bottom, and lighter scrap which did not stow compactly on top.

5. At the completion of the loading the barge was approximately on an even keel with a slight list to starboard. The draft was 9'9" at the stern, and 9'6" at the bow.

6. During the loading the bargee complained to the yard foreman about the heavy scrap on top. This indicates that the danger resulting from improper loading was reasonably apparent to him. However, upon completion of the loading he signed a loading report containing the notation "No damage." When asked by the pilot of the tug whether he was ready for towing, the bargee replied "Yes."

7. Shortly after the tug started towing the barge, some of the small, heavy pieces of scrap started to roll and drop to the bottom of the barge, causing a list to starboard toward the tug. As the small pieces of scrap continued to roll and drop to the bottom of the barge, the list increased to such a point it caused a dangerous list to port on the tug.

8. The chief engineer of the tug went aboard the barge while it was listing and accompanied the bargee while taking soundings. The soundings indicated no water was in the barge.

9. When it appeared that the list was becoming dangerous, the barge was beached. Subsequently it sank, resulting in damage to the barge and a loss of part of the cargo.

10. A survey of the barge in drydock, at a subsequent date, revealed that the starboard side was bulged out and the port side had been concaved inward. The coamings were laid over on their edge bolt fastenings. A rope was found in the bilge log seam on the starboard side near the bottom.

11. The barge had previously been damaged and repaired. In August, 1945 caulking was done under the water line and the bottom was respiked. In October, 1945, shortly before being towed to respondent's yard, the barge was overhauled above the low water mark. From these facts and from the fact that no water was found in the barge prior to its being beached, the court finds the barge to have been seaworthy.

### Conclusions of Law

1. Libellant was bailee of the cargo.

2. The court is satisfied, from the evidence, that the loading of the barge was accomplished in a negligent manner substantially as alleged, and that the improper loading was the proximate cause of the damage to the vessel.

3. Respondent was under a duty to load the barge in a reasonably prudent manner. Having failed to do so, it must respond in damages for the resultant injury. The S. C. L. No. 9, 3 Cir., 1940, 114 F.2d 964.

4. Respondent is not exonerated from liability because of the notation "No damage" contained in the loading report signed by the bargee.

5. A duty rested upon the bargee to use reasonable care to protect the barge from injury where the danger was reasonably apparent. The Daly No. 40, D.C.E.D. N.Y.1947, 76 F.Supp. 700. His permitting the barge to be towed when he knew she was in danger or when such danger was reasonably apparent was negligence, which contributed to the injury and should be imputed to his employer, the owner of the barge.

6. Libellant is entitled to recover one-half of the amount of provable damages resulting from the sinking of the barge and injury to the cargo.

Upon application, reference will be made to a commissioner for determination of the quantum of damages. An interlocutory decree may be submitted in conformity herewith.