CAMDEN IRON & METAL,
INC., Plaintiff,

v.

BOMAR RESOURCES, INC., Defendant.

Civ. A. No. 87–00736.

United States District Court,
D. New Jersey.

Aug. 9, 1989.

Archer & Greiner, P.C., Haddonfield, N.J. by Charles W. Heuisler, for plaintiff.

Clark, Ladner, Fortenbaugm & Young, Haddonfield, N.J. by Edward V. Cattell, Jr., for defendant.

COHEN, Senior District Judge:

## I. BACKGROUND

Plaintiff, Camden Iron & Metal, Inc., ("Camden Iron" or "plaintiff"), a New Jersey corporation, instituted this action for an alleged breach of contract for the sale of scrap metals against Bomar Resources, Inc., ("Bomar" or "defendant"), a Netherlands Antilles corporation with a principal place of business in New Jersey.[1] Plaintiff alleges that defendant breached a contract entered into on November 13, 1986 (whereby plaintiff was to furnish to defendant approximately 23,000 long tons[2] of scrap metal and trim, load and stow it aboard a vessel nominated by defendant), when the ship chartered by defendant was "unsafe, unsound and not capable of proper loading." Complaint ¶¶ 1, 3. Plaintiff's prayer for damages includes loss of profit on the underlying contract of sale and "costs attributable to defendant's failure to furnish a proper and sound vessel to take delivery," *id.* at ¶ 6, the sum of which plaintiff has calculated to be $245,096.02. Joint Final Pre-Trial Order ("JFPTO") at 5, 17.

Defendant countersued, maintaining, *inter alia,* that Camden Iron unilaterally breached a contract entered into on November 7, 1986 to sell 11,700 long tons of steel scrap to defendant (Count I of Counterclaim); that Camden Iron breached the November 13, 1986 contract by refusing to load the vessel supplied by Bomar despite the fact that it was ready for reasonably timely surveying and loading (Count II of Counterclaim);[3] that as a result of Camden Iron's breach of the November 13, 1986 contract, Bomar suffered damages for detaining and deviating the vessel it nominated (Count III of Counterclaim);[4] and that as a result of Camden Iron's breaches of both the November 7, 1986 and November 13, 1986 contracts, Bomar seeks compensatory and punitive damages because those breaches were "done with [a] conscious, willful intent to injure defendant and its business reputation," and plaintiff did in fact so damage Bomar's business reputation (Count IV of Counterclaim). Bomar prays for damages on its counterclaims in the amount of $1,554,423.64. JFPTO at 9.

This case was tried to the Court without a jury. To ascertain the sequence of events from "mere negotiation" to the existence (or not) of a valid contract, and ascribe responsibility for the failure to successfully complete the performance phase of the bargain, we have carefully considered the exhibits admitted into evidence, the oral arguments of counsel concerning objections that arose during the course of the trial, the post-trial submissions of the parties and, most importantly, the credibility of the witnesses. With respect to the

---

1. The jurisdiction of this Court is predicated on diversity of citizenship, pursuant to 28 U.S.C. § 1332, and not 28 U.S.C. § 1333 admiralty jurisdiction. *See infra.* Although Bomar is currently a citizen of New Jersey, at the time Bomar removed this action from Superior Court, Camden County, Law Division and had the complaint filed in this Court on February 27, 1987, Bomar was a citizen of New York. For diversity purposes, the citizenship of the parties at the time the original complaint was filed in the district court is controlling. *See, e.g., Smith v. Potomac Edison Company,* 165 F.Supp. 681, 686 (D.Md.1958).

2. A "long ton" is a unit of weight equivalent to 2,240 pounds or 1.016 metric tons. *The Random House Dictionary of the English Language* 1993 (2d ed. 1987).

3. *See also* JFPTO at 8; Defendant's Proposed Findings of Fact and Conclusions of Law ("Defendant's Trial Brief") at 5.

4. *See also* JFPTO at 9; Defendant's Trial Brief at 10–11.

latter, we have carefully scrutinized all the testimony given, the circumstances under which each witness testified, and every matter in evidence which tends to show whether a witness is worthy of belief. We have considered the skill, knowledge, intelligence and maritime experience of each witness called to the stand, as well as his manner and demeanor while testifying. Finally and significantly, we have appraised the opportunity of each witness to physically observe the condition of the vessel nominated by Bomar, that is, when and where each review took place. We issue this opinion in lieu of findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52.

## II. FACTS

On November 6, 1986, Bomar agreed to purchase 11,700 long tons (plus or minus ten percent) of steel scrap from Camden Iron according to the following schedule: (a) approximately 5,000 long tons of number one steel at $80 per long ton; (b) approximately 3,000 long tons of number two steel at $76 per long ton; (c) approximately 2,500 long tons of engine motor blocks at $83 per long ton; and (d) approximately 1,200 long tons of number two bundles at $60 per long ton. This agreement and the terms thereof were memorialized in a telex transmitted from Bomar to Camden Iron that day. (D–2).[5] The shipping term was to be "FOBST VESSEL[6] CAMDEN, NEW JERSEY", (D–2), which means that Camden Iron would bear the risk and expense of trimming and stowing the cargo aboard a vessel nominated and paid for by Bomar. Daniel Lewis, who in November and December of 1986 "headed up scrap operations for Bomar," (T2 at 3), testified that this November 6, 1986 contract was never performed because John Bantivoglio, President of Camden Iron, upon learning that Bomar intended to load additional scrap cargo purchased from one of Camden

Iron's competitors, Northeast Export, onto the ship to be provided by Bomar, "advised that he did not want to contribute to the cargo that would be loaded by that other party." (T2 at 9). Mr. Lewis maintained that his response to Mr. Bantivoglio's "advice" that he would not load the cargo was to "negotiate a way that we could work around that." (T2 at 10). Ultimately, Mr. Lewis chose to purchase the full amount of scrap steel needed by Bomar at that point in time (23,000 long tons) from Camden Iron. (T2 at 10). The foregoing testimony of Mr. Lewis represents the sole version of the events that transpired concerning Bomar's decision to enter into a subsequent contract with Camden Iron. No other evidence introduced by either party, demonstrative or parol, addresses this early stage of the Camden Iron/Bomar transaction, let alone controverts or corroborates it.

Having decided to purchase the full extent of its scrap requirements from Camden Iron, on November 13, 1986, Bomar agreed to increase its purchase of steel scrap from Camden Iron to 23,000 long tons (plus or minus ten percent) according to the following schedule: (a) approximately 10,850 long tons of number one steel at $80 per long ton; (b) approximately 4,650 long tons of number two steel at $76 per long ton; (c) a minimum of 5,500 long tons of engine motor blocks at $83 per long ton; and (d) a minimum of 2,000 long tons of number two bundles at $60 per long ton. This agreement and the terms thereof were confirmed by telex from Bomar to Camden Iron that day. (P–1). One of the covenants agreed upon was that the final weight and quality of the cargo would be determined "BY AN INDEPENDENT MARINE DRAFT SURVEYOR AND INDEPENDENT QUALITY INSPECTOR, WHOSE NOMINATION SHALL BE MUTUALLY AGREED AND WHOSE COSTS

---

**5.** Parenthetical references are to the exhibits admitted into evidence, e.g., (P– or D–), and the transcript by designating the first or second day of the two day trial and the correlative page number, e.g., (T1 at _____).

**6.** The term F.O.B. vessel, as defined by N.J.S.A. 12A:2–319, means "free on board", that is, that

the seller must bear the risk and expense of putting the goods on board the designated vessel. "FOBST" is a common maritime variation of the standard F.O.B. contract wherein the seller also agrees to "stow and trim" the cargo, that is, prepare the cargo and the vessel's holds to ensure efficient, safe loading. *See infra.*

SHALL BE SHARED EQUALLY." (P–1). Another stipulation was that payment was to be "Cash Against Normal Shipping Documents." (P–1). Like the November 6, 1986 contract, the shipping terms were "FOBST VESSEL CAMDEN, NEW JERSEY." (P–1). The penultimate paragraph of this telex acknowledgment states that "THIS CANCELS AND SUPERCEDES OUR PREVIOUS TLX OF NOVEMBER 6, 1986." (P–1). Finally, this telex closed by noting that "ALL OTHER TERMS AND CONDITIONS AS PER RELEVANT CHARTER PARTY AND STANDARD BUYING TERMS OF BOMAR RESOURCES, INC." (P–1).

Mr. Lewis testified that it was his "belief" that at some point in November of 1986, Bomar advised Camden Iron of its nomination of the M/V Kalli ("Kalli"),[7] and that despite the fact that this designation was subject to Camden Iron's approval, Bomar received no notice of rejection from Camden Iron prior to the Kalli's arrival in the Port of Camden.[8] (T2–12). Camden Iron did however, advise Robinson & Mastrangelo, Inc., ("R & M"), shipping agents for Bomar, that apropos of certain information conveyed by the Master of the Kalli concerning its bale cubic capacity, it "could not load 20–2100 tons" and would even be difficult to load 19,500 tons. This is confirmed by a telex from R & M to Bomar, with a copy to Camden Iron, dated December 5, 1986. (P–2). Similarly, on December 9, 1986, Tager Shipping Co. ("Tager"), (Camden Iron's shipping agents) telexed Bomar about its concern over the Kalli's bale cubic capacity. (P–3). This telex communicated that Camden Iron "CANNOT BE HELD RESPONSIBLE IF VESSEL UNABLE TO LOAD A CARGO OF 20,700 LONG TONS OR MORE." (P–3).[9] Tager asked that Bomar acknowledge receipt of this telex. (P–3). There is no evidence or testimony which establishes that Bomar did so respond.

On December 14, 1986, late in the evening, the Kalli arrived at South Jersey Port Corporation's ("SJPC") Beckett Street Terminal in Camden, New Jersey. R & M presented its "Notice of Readiness" (the document by which the charterer of a vessel notifies the cargo supplier that the vessel is now ready to commence loading) to Tager during the afternoon of December 15, 1986. A draft survey was attempted on December 15, 1986 by Captain Geiser (representing Hyundai Corporation),[10] Captain Cole (representing Bomar) and Peter Kelman (representing Camden Iron). Mr. Kelman testified that all three surveyors concurred that the Kalli could not be accurately surveyed that day, because of their inability to account for excessive water present in the three conveyor ducts which run the full length of the ship. (T1 at 68–70, 75). In the three to four hours

---

**7.** In maritime nomenclature, "M/V" is an abbreviation of "motor vessel".

**8.** Through the testimony of Aaron David Dobrinski, *see infra,* Bomar tried to establish that Camden Iron could have learned that the ship Bomar nominated was a "self-unloader" (i.e., had a large unloading boom) with small hatches antecedent to its arrival in Camden by consulting Lloyds Register, ("Lloyds"), a publication which lists, *inter alia,* specifications of maritime shipping vessels. (T2 at 97–104) (D–15). On November 21, 1986, Bomar nominated the vessel "Akalli Seri." Letter from Edward V. Cattell, Jr., Esquire to this Court (April 19, 1989) at 1. It is unclear from the evidence and testimony adduced at trial precisely how and when Camden Iron came to realize that the Akalli Seri was renamed the Kalli. Nevertheless, as the Court noted on the record at trial, (T2 at 102), we remain skeptical about Camden Iron's ability to interpolate from the entry in Lloyds (which D–15 lists, incidentally, not even as the Akalli

Seri but under the moniker "Ontario Power") the specifications of the Kalli. Mr. Dobrinski was unable to recall what volume of Lloyds (D–15) was culled from, whether subsequent Lloyds updates tracked the sequence of name changes from Ontario Power to Akalli Seri to Kalli, and whether or not every ship must necessarily be listed in Lloyds at all. (T2 at 100–04).

**9.** 20,700 long tons of cargo represents the minimum quantity that must be loaded under the November 13, 1986 contract. Because a deviation of plus or minus ten percent would have been acceptable, the 20,700 figure represents the result of 23,000 minus ten percent.

**10.** Hyundai, a Korean corporation, had entered into a contract to purchase 23,000 long tons of steel scrap from Bomar. (D–1). To fulfill the requirements of that commitment, Bomar entered into the contracts which are the subject of this lawsuit.

these draft surveyors were on board, Mr. Kelman estimated that some fifteen to twenty tons of water leaked out of the Kalli's forepeak tank (a "ballast" tank). (T1 at 71). Upon "sounding the tanks" (the process of calculating the weight of liquids present on a ship), the three surveyors quantified a "draft survey constant" of 1,500 tons, when 300 to 400 would have been "normal" for a ship like the Kalli. (T1 at 66, 68). *See also* (P–10) (handwritten mathematical calculations of Mr. Kelman on behalf of all three surveyors to determine constant, executed contemporaneously on December 15, 1986). Although the "normal" surveying methodology is to have the vessel's tanks "pressed up" before undertaking any sounding, Mr. Kelman's request that the Kalli's tanks be pressed up was denied by the ship's First Officer, who explained that "owing to the vessel's age ... he [the First Officer] did not want to put this excessive strain on the tank tops because he was afraid ... that he may ... inadvertently flood the holds." (T1 at 65–66, 80–81). In addition to the refusal of the Kalli crew to press up its tanks and the surveyors' general inability to obtain an accurate draft survey on December 15, 1986, Mr. Kelman testified about several observations he made concerning the physical condition of the vessel itself.

First, Mr. Kelman noted his concern that the hatch coamings [11] although rusted to a degree within tolerable limits, were palpably narrow given the type of leading technique that Camden Iron intended to utilize at the Beckett Street Terminal (fourteen by twenty-seven foot loading "pans"). (T1 at

72). *See infra.* Second, Mr. Kelman took cognizance of the fact that the Kalli, which was designed to carry ores and grains on the Great Lakes,[12] had a conveyor system running along the bottom of its holds which remained "uncovered" and fully "exposed." (T1 at 72). The testimony of Mr. James MacFarland, the Tager executive charged with responsibility for Camden Iron's interests in the subject transactions, highlights the significance of Mr. Kelman's concerns for Camden Iron.[13]

Mr. MacFarland pointed out that under the terms of the November 13, 1986 contract, any damage to the hatch openings or coamings incurred during loading would have been Camden Iron's responsibility, (T1 at 26), and the confluence of the Kalli's unusually small hatch size and SJPC's pan loading technique would have compromised the watertightness of the vessel if inadvertent contact was made between the pans and the hatches. (T1 at 22, 23). Captain Kenneth Mistry (who was retained by R & M to attend a draft survey scheduled for December 17, 1986) testified on behalf of Bomar that the "hatch openings will slow down operations very much." (T1 at 154). On the subject of small hatches, Joseph Balzano, Port Director of SJPC testified that:

> there was no doubt that it was very tight for a scrap pan to enter or exit the hatch. I knew that if it was attempted, that there would be damage [due to] no fault of the crane operators but just ... the normal swinging of the scrap pan.

(T1 at 88).[14] Mr. Kelman concurred during his cross examination that because the

---

**11.** According to *Webster's Third New International Dictionary* 432 (3d ed. 1963), a coaming is "the raised frame of wood or steel around a hatchway, skylight, or other opening in the deck of a ship to prevent water from running below."

**12.** Mr. MacFarland explained that the conveyor system at the bottom of the holds was designed to handle "light products" that can flow easily along the conveyor and out of the ship through its "self-discharging boom." (T1 at 23).

**13.** While we are cognizant that Mr. MacFarland was an "interested witness," (he is currently employed by Camden Iron) (T1 at 5), we found

his testimony eminently credible and worthy of belief.

**14.** Captain Mistry attempted to minimize the significance of the Kalli's hatch sizes as it related to pan loading:

> I did say to my client [R & M] ... they are not big openings. But they are going to be tight for this particular pan which they use for leading ... but certainly the [hatch] opening was larger than the size of the pan.

(T1–145). Although Captain Mistry's evaluation may very well be accurate in the strictest sense, it fails to take into account the critical concern over the natural "swinging" of the pan during

pans were smaller than the hatch openings, with "able care," it is theoretically possible to load without incident. However, Mr. Kelman went on to avow that as a practical matter, the "maneuverability" of the pan (the ability to go "forward or aft or the other side") would be affected, thereby setting the stage for "quite considerable damage." (T1 at 77).

Captain Mistry's testimony established that maneuverability, that is, the ability to safely place materials inside the Kalli's hold via loading pans, becomes increasingly restricted "as the cargo rises." (T1 at 158). Captain Mistry elaborated on this further during his cross examination:

A. [W]hen the cargo rises above a certain area, with the hopper tanks and other things over there, they would be restricted. So, therefore, you would need another method of getting the cargo away from the openings after a certain weight is reached.

Q. Now if this were a standard bulk cargo carrier with a wider hatch opening, you won't have that problem. You could just move the pan to the various sides.

A. Yes. And you put it down.

(T1 at 159).

Like its responsibility for the condition of the hatch coamings, according to Mr. Mac-Farland, Camden Iron would also have been responsible for any damage to the conveyor system in its uncovered state which may result from loading extremely heavy steel scrap cargo directly upon it. (T1 at 26). Although any damage to the conveyor system would not actually have been charged to Camden Iron because the Kalli was on its "terminal voyage" (the vessel itself was to be scrapped at the discharge port in Korea), this fact was never made known to Camden Iron or Tager.

(T1 at 48–49.) *See also* (T1 at 153) (Master and Chief Officer of Kalli informed Captain Mistry that vessel was on "graveyard voyage"). In addition to testifying about the hatch size problem, the exposed conveyor problem and the vessel capacity problem, *see supra*, Mr. MacFarland also testified about two additional obstacles to the execution of the November 13, 1986 contract, from Camden Iron's point of view.

According to Mr. MacFarland, the usual vessel tendered for "bulk cargo type loading" of scrap metal has five or six hatch openings, whereas the Kalli had fifteen. (T1 at 21). In his estimation, the larger number of hatch openings "made access into the lower holding ... much more restricted than normal." (T1 at 21). Presumably, the numerosity of hatches would contribute to significant slowing down of loading operations, as Captain Mistry observed. (T1 at 154). *See supra.*

Mr. MacFarland also asseverated that the Kalli's unloading arm, which extended some 220 feet across the length of the ship, could not be moved more than 10 to 20 degrees in either direction, thereby impeding access to at least some of the hatches. (T1 at 53). Nevertheless, even if the unloading arm could have been moved while the Kalli was berthed at Camden, Mr. MacFarland urged, it would have had to have been swung over the port side (the loading cranes accessed the vessel along her starboard side), some two hundred feet into the navigable waterway. (T1 at 21). To this, Mr. MacFarland opined, there was a "good chance, a good probability" that the Coast Guard would have objected. (T1 at 21).

All of Mr. MacFarland's concerns were memorialized and enumerated in two telexes sent by him to Bomar on December 15, 1986, at 11:01 A.M. and 12:00 P.M. respectively. (P–5, P–6).[15] The first telex re-

---

the course of ordinary loading. In fact, Captain Mistry acknowledged in later testimony that although the loading pans were "low enough to turn," their "swing is restricted." (T1 at 154).

**15.** In addition to the problems addressed thus far, two other concerns, albeit less significant, surfaced during the trial. First, a telex from Joseph A. Balzano, Port Director of SJPC, to Mr. Bantivoglio on December 16, 1986 noted that

the Kalli's "DECK APPEARS TO BE VERY UNSTABLE." (P–7). During his direct testimony, Mr. Balzano elaborated on the condition of the deck:

The crane operators were concerned that the ... hatch coamings were very flimsy. I went aboard the vessel on the 16th of December. And I noted there was a lot of rough scaling on the deck. The hatch coamings were pretty much deteriorated and there were pin holes

quested that Bomar "PLEASE URGENT-LY RESPOND WITH YOUR INTEN-TIONS THIS VESSEL." (P-5). The second telex closed with a similar appeal: "PLEASE URGENTLY RESPOND WITH YOUR INTENTIONS THIS VESSEL AND HOW WE SHOULD PROCEED?" (P-6). No written response to these telexes was proffered by Bomar. (T1 at 105). R & M, however, did propound a series of three telexes upon Tager and Camden Iron to inform them that the owners of the Kalli, Skaarup Shipping, Inc., had appointed Captain Mistry to attend a new draft survey called by R & M. (D-6 at 1-3). The first telex called for a survey on December 16, 1986 at 3:00 P.M. (D-6 at 1). This was revised in the second telex to December 17, 1986 at 3:00 P.M., which telex also warned that failure of Tager/Camden Iron representatives to attend would result in the owners' considering the 3:00 P.M. survey "FULL AND FINAL ON ALL PARTIES INVOLVED." (D-6 at 2). The third telex rescheduled the 3:00 P.M. survey to 5:30 P.M. that day, December 17, 1986, and also advised that "SURVEYORS FOR THE RE-CEIVERS AND CHARTERERS WILL ALSO ATTEND." (D-6 at 3). Mr. Bantivoglio declined to send a Camden Iron representative to the second survey because "there had been no response to prior communications." (T1 at 108-09).

Following Mr. Balzano's visit to the Kalli on December 16, 1986, he sent a telex to Mr. Bantivoglio outlining his concern over the smallness of the hatch openings and the instability of the deck. (P-7). *See supra.* This telex went on to state the following:

DUE TO THE SMALL HATCH OPEN-NINGS [SIC] AND CONDITION OF DECK, I WISH TO INFORM YOU THAT SOUTH JERSEY PORT CORPO-RATION WILL HAVE TO BE HELD HARMLESS IN THE EVENT THAT ANY DAMAGE OCCURS TO THE VES-SEL. IN ADDITION THERETO, IF THIS CAUSES ANY DAMAGE TO OUR SCRAP PAN OR LIFTING GEAR AT-TACHED TO OUR CRANE DUE TO THE SMALL HATCH OPENINGS, YOU WILL BE RESPONSIBLE FOR SAID DAMAGES.

(P-7). Having received P-7 from Mr. Balzano and spoken to representatives from M.J. Rudolph Corporation (the stevedoring [16] contractors retained by Camden Iron to load the Kalli) ("M.J. Rudolph"), Mr. Bantivoglio concluded that he was "dealing with a whole different set of circumstances than was customary or ordinary." (T1 at 104). As a response thereto, Mr. Bantivoglio declared at trial, he "proceeded to instruct Tager Shipping to advise Bomar of a number of circumstances for us to proceed with." (T1 at 104-05). The "circumstances" to which Mr. Bantivoglio referred were manifested in a telex from Tager to Bomar that day, (P-9), which suggested, *inter alia:* (1) that a hold harmless certificate be issued, in a form acceptable to "approved legal counsel," indemnifying Camden Iron, SJPC and M.J. Rudolph for "potential consequences and legal actions" resulting from loading and sailing the Kalli (¶¶ 1-2); (2) that the mode of ascertaining cargo tonnage be changed from draft survey to use of "scale weights" (¶ 3); (3) that if the foregoing three paragraphs are duly complied with, Bomar must guarantee that the Kalli's unloading boom will neither impede commerce on the Delaware River, nor impede access to the Kalli by shore cranes

that I could see through. And it was very evident to me that they couldn't take much banging of scrap pans. There would be damage or collapse of the hatch coaming. (T1 at 94). Although Captain Mistry, upon directly observing the same hatch coamings, concluded that despite the rest the vessel was "seaworthy" and suitable to carry a cargo of steel scrap, (T1 at 150-51), his testimony failed to address the crucial question of whether the coamings in their rusted condition would survive repeated contact with scrap pans.

The second problem which received only brief mention at trial was Captain Mistry's observation that the scrap would need "additional trimming" if the Kalli was to "take on full cargo." (T1 at 154). This was the only reference to the adequacy of Camden Iron's trimming efforts.

16. In the maritime industry, "stevedores" are the labor force who work at and are responsible for loading and unloading ships in port. *Webster's Third New International Dictionary* 2239 (3d ed. 1963).

attempting to load (¶ 4); (4) that the payment term be changed from cash against normal shipping documents to funds in escrow, released on presentation of scale weight certificate duly signed by Camden Iron and Tager (¶ 5); (5) that a representative of the Kalli's class society certify the ability of the Kalli to safely transport the subject cargo to final destination (¶ 6); (6) that because of the design of the vessel, Camden Iron, SJPC and M.J. Rudolph must be relieved of its obligation to load the contractual cargo quantity (¶ 7); (7) that Bomar reimburse Camden Iron for stevedore labor contracted for December 15, 1986 (¶ 8); (8) that Bomar seriously consider alternatives to "minimize its predicament," such as loading the cargo Bomar has at Northern Metals (¶ 9); (9) that Bomar remove the Kalli pending negotiation of the foregoing (¶ 10).

Bomar never responded in writing to any of the points raised in P–9. (T2 at 32, 38–39). From the time P–9 was sent until December 18, 1986, Mr. Bantivoglio had two or three telephone conversations with Mr. Lewis, (T2 at 122), who headed up scrap operations for Bomar, (T2 at 3), the clear focus of which centered on Mr. Bantivoglio's request for a written response from Bomar on the indemnification question. (T2 at 124). Mr. Bantivoglio testified that he was unable to procure a satisfactory acknowledgment of accord, written or oral, (T2 at 123–24), although Mr. Lewis recalls "a very loose discussion" [17] wherein Bomar orally agreed to indemnify Camden Iron for damages to the Kalli, but not an "unlimited indemnification" such as that which Bomar believed Camden Iron to be seeking. (T2 at 41–42).[18] Mr. Bantivoglio was aware that R & M had called for a second survey, *see supra,* but he declined to send a Camden Iron representative because Bomar had not responded to his "prior communications." (T2 at 108). According to Mr. Bantivoglio, a draft survey on December 17, 1986 would not have resolved any of the problems articulated to Bomar up until that point for three reasons: one, the Kalli was still "unsurveyable" because it "couldn't press its tank," (T1 at 112); two, Bomar would not grant Camden Iron the indemnification it requested, (T1 at 109); and three, a survey would have been futile in light of Mr. Bantivoglio's personal

---

**17.** On the other points raised in P–9, Mr. Lewis' recollection was far less vivid or detailed. *See, e.g.,* (T2 at 26) (Mr. Lewis "thinks" he discussed possibility of using scale weights with Mr. Bantivoglio); (T2 at 26) ("I actually don't know who commented or responded to [Camden Iron's request for guarantee that unloading arm would not impede navigable waterway or loading cranes]"); (T21 at 26–27) ("I think [response to request for Bomar's payment of monies to be deposited into escrow] was just conversations over the phone"); (T2 at 27) (Mr. Lewis "believes" arrangements were made for class certifications to be forwarded and to have a Lloyd's surveyor recertify the Kalli); (T2 at 27) (Mr. Lewis "vaguely remembers" "some discussion" about the problem over the Kalli's bale cubic capacity but does "[not] know the outcome of that"); (T2 at 27) (Mr. Lewis "thinks" that Bomar agreed to reimburse Camden Iron for stevedore labor hired for December 15, 1986); (T2 at 28) (Mr. Lewis "[doesn't] think" Bomar responded to paragraphs nine and ten of P–9 "at all").

Mr. Lewis was also "unsure" of other facts during his direct testimony and cross examination. *See, e.g.,* (T2 at 28, 30–32, 39).

**18.** On this point, Mr. Lewis' testimony was buttressed by that of Mr. Aaron David Dobrinski, another Bomar employee. Mr. Dobrinski testified that P–9 was essentially asking for a "wide open indemnification against anything that could happen [not limited] in any manner whatsoever." (T2 at 86).

Mr. Dobrinski testified that on the evening of December 16, 1986 or early in the morning of December 17, 1986, (T2 at 85), ("I can't recall the exact time"), he spoke to Mr. Larry Sigmund, Camden Iron's Operations Manager, and Mr. Bob Bonis, Camden Iron's Purchasing Agent, and informed them of Bomar's willingness to indemnify Camden Iron for damages to the vessel during loading and assured them that "the boom was not a problem." (T2 at 85–86). On cross examination, it was revealed that Mr. Dobrinski did not know what either Mr. Bonis' or Mr. Sigmund's positions were at Camden Iron, (T2 at 105–06), or the circumstances under which he came into contact with either of them with respect to resolving the problems outlined in P–9. (T2 at 107). Mr. Dobrinski also acknowledged that he did not know who Mr. Bantivoglio was, much less have any conversations with him. (T2 at 108).

Mr. Sigmund was called by Camden Iron as a rebuttal witness, and denied ever speaking to Mr. Dobrinski. (T2 at 117) Mr. Sigmund's only contact with Bomar was through Mr. Lewis, who never offered Camden Iron or their stevedores an indemnification of any sort during the period in question. (T2 at 118).

observations of "the general condition of the vessel." (T1 at 108–09).

Mr. Peter Siebel, Jr., President of Beltic Marine Corp., visited the Kalli on December 17, 1986 and certified to a Mr. Bentlarson and Mr. Skaarup of Skaarup Shipping, Inc. (the owners of the Kalli) that the boom "was not capable of being moved on December 17 because they didn't have the electrical connections ... the electrical connections were not in proper operating order on December 17th." (T2 at 81). Captain Mistry testified that on December 17, the boom was "fixed" and capable of being moved. (T1 at 146). However, for this appraisal, Captain Mistry relied *exclusively* on representations made by the Kalli's Chief Officer.[19] Captain Mistry never directly observed the boom move more than eight to ten degrees. (T1 at 147).

## III. DISCUSSION

### A. *Liability*

#### 1. Camden Iron's Claim That Bomar Breached The November 13, 1986 Contract

■ Simply stated, the legal question with respect to Camden Iron's direct claim against Bomar is whether Bomar breached its obligations under the November 13, 1986 contract (P–1) by failing to furnish a vessel (1) capable of a proper draft survey; and (2) "reasonably suited to the receipt of the goods." N.J.S.A. 12A:2–503(1)(b). The inquiry is somewhat complicated, however, by the fact that the contract itself is silent on the crucial questions that have been raised concerning the hatches (to wit, their size and number), and the draft survey (namely mode of surveying[20] and the time-

table for completing it.) Framed another way, the explicit contract language reflects an "absence of expectation," that is, both Camden Iron and Bomar completely failed to contemplate the potentiality that a vessel like the Kalli might be tendered and thus, neither party had any reasonable expectations concerning such a contingency to have warranted memorialization in writing. *See* Farnsworth, *Disputes Over Omission in Contacts*, 68 Colum.L.Rev. 860, 860–62, 891 (1968) ("Farnsworth, *Disputes Over Omission*"). *Cf.* Bloomfield, *The Role of Foreseeability In Allocation of Risk Under UCC 2–615*, 21 S.Tex.L.J. 441 (1980).

A well worn axiom of contract law is that "when a contract is clear, the court is bound to enforce its terms as they are written," *Wells v. Wilbur B. Driver Co.*, 121 N.J.Super. 185, 198, 296 A.2d 352 (Law Div.1972), for it is beyond the proper domain of the judiciary to "make a different or a better contract than the parties themselves have seen fit to enter into." *Washington Constr. Co. v. Spinella*, 8 N.J. 212, 84 A.2d 617 (1951). However, in a *casus omissus*[21] such as the matter presently at bar, where the four corners of the parties written agreement fail to provide for the dispute at hand, it is up to the court to fill the gap left by the contracting parties. E. Farnsworth, *Contracts* § 7.16 at 523 (1982) ("Farnsworth, *Contracts*"). *See generally* Restatement (Second) of Contracts § 204 (1981) ("[w]hen the parties to a bargain ... have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied

---

**19.** Captain Mistry sought to vindicate his reliance on the observations of others for his own survey conclusions by remarking that in his industry, it is not uncommon to rely on information provided by ship personnel. (T1 at 149). We note, however, that this is hearsay which does not fall within an evidentiary exception or exemption. *See* Fed.R.Evid. 801, 803, 804.

**20.** By this, we mean the question of whether a proper survey necessarily involves the ability of the Kalli to press its tanks.

**21.** *"Casus omissus"* is defined as "[a] case omitted; an event or contingency for which no pro-

vision is made." *Black's Law Dictionary* 275 (4th ed. 1968). Professor Farnsworth provides an alternative definition of *"casus omissus"*:

A case which is not provided for. When such cases arise in statutes which are intended to provide for all cases of a given character which may arise, the common law governs.... A *casus omissus* may occur in a contract as well as in a statute....

Farnsworth, *Disputes Over Omission, supra,* at 862 n. 11 (quoting 1 J. Bouvier, Law Dictionary 431 (8th ed. 1914)).

by the court"). As one New Jersey court stated this fundamental precept:

> Terms, although not specifically set forth, may be implied where the parties must have intended them because they are necessary to give business efficacy to the contract as written, or to give the contract an effect which the parties, as fair and reasonable, presumably would have agreed on if, having in mind the possibility of the situation which has arisen, they contracted expressly in reference thereto.

*Berkeley Dev. Co. v. Pacific Tea Co.*, 214 N.J.Super. 227, 240, 518 A.2d 790 (Law Div.1986) (citations omitted). Of course, "implied covenants and terms of a contract are as effective components of the agreement as those expressed." *Aronsohn v. Mandara*, 98 N.J. 92, 100, 484 A.2d 675 (1984). It is generally accepted that the law of sales governing the mercantile community is the Uniform Commercial Code. *See, e.g.*, G. Gilmore and C. Black, *The Law of Admiralty* 100–02 (1975). Consequently, we shall look to New Jersey's Uniform Commercial Code, N.J.S.A. 12A:1–101 to 12A:2–725, and the common law of contracts for guidance.

One essential contract term that the parties *did* provide for, concerned their respective responsibilities vis a vis the shipment of the steel scrap. Specifically, P–1 provided the following clause: "FOBST VESSEL CAMDEN, NEW JERSEY." The New Jersey Uniform Commercial Code ascribes meaning to the "F.O.B." term:

> (1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place ... is a delivery term under which
>
> (a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this Chapter (12A:2–504) and bear the expense and risk of putting them into the possession of the carrier;
>
> \* \* \* \* \* \*
>
> (c) when ... the term is also F.O.B. vessel ... the seller must in addition at his own expense and risk load the goods on board.

N.J.S.A. 12A:2–319. Thus, Camden Iron bore the responsibility, risk and expense of physically loading the cargo of steel scrap it sold to Bomar onto the Kalli. However the term "FOBST" is a common maritime variation of the standard F.O.B. contract, for superimposed on top of the Camden Iron's traditional F.O.B. obligations, is the covenant to "stow and trim" the cargo. This means that the seller must prepare the cargo and the vessel's holds to ensure efficient, safe loading. We find, however, that a seller's obligation to load goods on board a ship is not an absolute one, and is subject to several important qualifications implicit in *every* FOBST contract.

N.J.S.A. 12A:2–503(1)(b) provides that "unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods." That the buyer must tender a reasonable vessel in the specific context of an F.O.B. contract is reinforced by the explicit cross reference to N.J.S.A. 12A:2–504 in the textual body of N.J.S.A. 12A:2–319(1)(a). *See supra.* The "manner" in which goods must be shipped, according to N.J.S.A. 12A:2–504, includes, *inter alia*, designation of a carrier "as may be reasonable having regard to the nature of the goods and the circumstances of the case." N.J.S.A. 12A:2–504. It is the "unreasonableness" of the Kalli, both as to its structure and its physical condition in December of 1986 coupled with a general unwillingness on Bomar's part to mitigate the consequences by accepting the terms of Camden Iron's good faith attempts to modify the contract, *see infra*, that enables us to conclude that Bomar breached the November 13, 1986 contract.

Much evidence was adduced, by witnesses for plaintiff and defendant alike, that in their collective maritime experience, they had never seen a vessel quite like the Kalli, a self-discharging grain and ore carrier boasting numerous hatches with small openings, tendered for the haulage of scrap metal. *See, e.g.*, (T1 at 15) (Mr. MacFarland); (T1 at 82) (Mr. Kelman); (T1 at 89–90) (Mr. Balzano); (T1 at 101) (Mr. Ban-

tivoglio); (T2 at 59–60) (Mr. Avagliano).[22] The number and size of hatches on the Kalli materially changed not only the risks that Camden Iron could reasonably have foreseen with respect to damaging the vessel during loading, but the expense involved as well, for a slower loading rate means, *ipso facto*, a costlier steeve.

 Generally, a stevedore owes a duty to exercise ordinary care while loading, that is, "the same care and diligence an ordinary prudent and skillful person would use in loading ... under the same circumstances." *Federal Barge Lines, Inc. v. Granite City Steel*, 608 F.Supp. 142, 147–48 (E.D.Mo.1985). *Accord O'Donnell Transp. Co. v. Tidewater Iron & Steel*, 90 F.Supp. 953, 954–55 (D.N.J.1950) ("A duty rests upon [the party bearing risk of loading] to use reasonable care to protect the [vessel] from injury where the danger was reasonably apparent"). Stevedores are liable for damage caused by their negligence, *Dempsey & Assoc. v. S.S. Sea Star*, 461 F.2d 1009, 1016 (2d Cir.1972), which liability includes "all foreseeable and proximate losses incurred as a result of the stevedore's negligence." *Granite City Steel, supra*, at 149. It is clear that even the "slightest contact" between steel cargo and a hatch coaming during loading "would occasion pressure that would cause more than the slightest mechanical damage." *Copco Steel & Eng'g. Co. v. S/S Alwaki*, 131 F.Supp. 332, 335 (S.D.N.Y.1955). In light of the substantial likelihood that the "normal" swinging of scrap pans would have damaged the Kalli, thereby compromising its seaworthiness,[23] it would have been negligence for M.J. Rudolph (or any other stevedore for that matter) to ignore this reasonably apparent danger and attempt to load the vessel anyway.

Faced with the small hatches of the Kalli and a fully exposed and vulnerable conveyor system running the full length of the holds, then, M.J. Rudolph was entitled to the indemnification it sought from Camden Iron. For the very same reason, Camden Iron, in turn, should have been granted the written indemnification it sought from Bomar covering damage to the Kalli during loading. Bomar's refusal to do so, under the circumstances, was *per se* unreasonable. Mr. Lewis' position that Camden Iron sought a "wide-open" indemnification clause which would have granted it absolute, unqualified insulation for any and all acts of negligent or intentional conduct is not substantiated by the evidence. Mr. Lewis defended his refusal to follow up, in writing, Camden Iron's repeated requests for indemnification (or any of the other points raised in P–9) because of his policy not to "confirm [oral disagreements] unless it's just to "get into war." (T2 at 46). Yet Mr. Lewis would subsequently grant to Schiavone–Bonamo Corporation, precisely that which Camden Iron so desperately sought. *See infra.*

According to the evidence adduced at trial, in response to Mr. Balzano's request on December 17, 1986 that the Kalli leave the Beckett Street Terminal on December 18, 1986 at 8:00 A.M., the Kalli finally left approximately fourteen hours after Mr. Balzano's deadline. (T1 at 95–96). *See also* (P–11). The vessel went into a layup berth until Bomar made alternative arrangements for another cargo in February, 1987. At that time, the Kalli docked at Claremont Terminal, Bayonne, New Jersey, in order to be loaded with steel scrap cargo purchased by Bomar from Schiavone–Bonamo Corporation ("S–B"). There, the stevedores retained by S–B requested of S–B indemnification for damage to the Kalli during loading, much like M.J. Rudolph

---

**22.** Peter J. Avagliano, Vice President of Schiavone–Bonamo Corporation, was responsible for ultimately loading the Kalli with alternative cargo in February, 1987. *See infra.*

**23.** "Seaworthiness" is addressed to the question of "whether [a] vessel is reasonably fit to carry the cargo which she has undertaken to transport." *Martin v. Steamship Southwark*, 191 U.S. 1, 9, 24 S.Ct. 1, 3, 48 L.Ed. 65 (1903). *Accord*

*McAllister Lighterage Line v. Insurance Co. of North America*, 143 F.Supp. 697, 699 (S.D.N.Y. 1956). Because it is accepted that "in order for a motor vessel to be seaworthy it is necessary that its hatchways be watertight," *The Guanancita*, 69 F.Supp. 928, 930 (S.D.Fla.1947), any significant damage to the hatches is a matter of utmost concern in the maritime industry.

requested of Camden Iron. However, unlike Camden Iron's request, S–B's appeal was granted *in writing.* (T2 at 56, 61). Had Bomar dealt with Camden Iron in good faith, which we find that it did not, it would have tendered to Camden Iron at least a *proposal* with indemnification language acceptable to Bomar, similar to that ultimately offered to S–B. Having said this, we find Bomar's performance concerning indemnification to have been unreasonable under the circumstances.

We also conclude that even if M.J. Rudolph had proceeded to load the Kalli without first being indemnified, its efforts would ultimately have been futile in light of the electrical problems with the boom during the period in question. Mr. Lewis testified that by the morning or early afternoon of December 16, 1986, this problem had been corrected. (T2 at 50). Captain Mistry was "told" the problem had been corrected by the First Officer. (T1 at 147). The overwhelming credible evidence directly contradicts this. Those who visited the Kalli during the period in question and made direct observations of the ship all testified that the boom could not be moved more than a few degrees in either direction up until the day it left Camden, on December 18, 1986. We do not see the relevance of Mr. Siebel's testimony that the boom was fully operable on *January 31, 1987* to this inquiry. (T2 at 81). In fact, Mr. Siebel testified that the boom was *not* capable of being moved on the date of his first visit to the Kalli, December 17, 1986. (T2 at 81–82). Likewise, Mr. Avagliano's testimony that the boom moved effortlessly off shore in late February of 1987,[24] (T2 at 61), does little to prove the Kalli's readiness to load in mid-December of 1986.

We also do not set the relevance of the fact that S–B had no problem loading the Kalli with the "orange peel grapple" method in February of 1987. (T2 at 57–58). We note two things about this testimony. First, the grapple and pan methods are radically different loading techniques, with different requirements as to minimum hatch size. Mr. Avagliano made it clear that S–B would *not* have loaded the Kalli at its Albany, New York facility where pans sixteen feet by thirty feet are utilized. (T2 at 59). When asked if pans "smaller" than those used at Albany could have enabled the Kalli to be loaded without complications, Mr. Avagliano merely replied "possibly." (T2 at 60) Pans are a standard method for loading scrap and Bomar was aware not only that Camden Iron used this technique, but the exact dimensions of Camden Iron's pans because it is uncontested that Mr. Bantivoglio loaded at least two prior vessels for Bomar in Camden. (T1 at 103–04). Second, Mr. Avagliano loaded a cargo of "plate and structural steel" at Bayonne. No testimony was heard concerning the relative burden or risk of loading this type of cargo as compared to the cargo Camden Iron was prepared to load, other than a broad generalized statement that whether by grapple or pan, it was "capable" of being loaded. (T2 at 65).

An important condition of the charter party[25] agreement between Gulfmar Transportation C.V. of Connecticut ("Gulfmar") (the owners of the Kalli) and Bomar (as charterers of the Kalli) clearly states that "ON ARRIVAL AT LOADING PORT ALL FULL BALLAST TANKS ARE TO BE PRESSED, ALL EMPTY TANKS ARE TO BE STRIPPED." (D–5 at ¶ 21). There is no dispute that the Kalli was unable to press or strip its tanks during the period in question at the Beckett Street Terminal. *See, e.g.,* (T1 at 80–81, 155–56). Although Captain Mistry testified that with calibration tables, it is possible to do an accurate

**24.** It is interesting to note that Port Claremont Terminal was a "private channel." (T2 at 61). Consequently, when Mr. Avagliano had the boom swung offshore there, no navigable channel was blocked, a result unavoidable at the Beckett Street Terminal.

**25.** The "charter party" is a maritime agreement "by which the charterer ... obtains the use and

service of all or some part of a ship for a period of time or a voyage or voyages." *Larsen v. A.C. Carpenter, Inc.,* 620 F.Supp. 1084, 1106 (E.D.N.Y.1985) (citations omitted). Roughly speaking, it is a "rental agreement" for a vessel entered into by the charterer (the renter) and the vessel's owner.

survey without pressing the tanks, (T1 at 155–56), we are persuaded that the clear understanding of all concerned parties (Camden Iron, Bomar and Gulfmar) was that the Kalli's tanks would be pressed. Thus, as a matter of law, the tender of a ship incapable of having its ballast tanks pressed when such an expectation was in conformity with regular usage of trade,[26] is insufficient to satisfy Bomar's obligation to "furnish facilities reasonably suited to the receipt of the goods." N.J.S.A. 12A:2–503(1)(b). Bomar has failed to discharge its obligation of "good faith" in its performance, N.J.S.A. 12A:1–203, by not observing a "reasonable commercial standard [ ] of fair dealing in the trade," N.J.S.A. 12A:2–103(1)(b), to wit, the accepted standard of pressing a vessel's tanks as a condition precedent to a draft survey.

Because the condition of the Kalli in December of 1986 (the size and number of hatches, the exposure of the conveyor system, the inability to press its tanks, and the immobility of the loading arm) changed in a material and significant way the reasonable risks contemplated by Camden Iron at the time of contracting, we conclude that the additional terms suggested by Camden Iron in P–9, were, under the circumstances, reasonable modifications of the original contract. N.J.S.A. 12A:2–614 provides as follows:

(1) Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

One commentator notes that "the evident purpose of section 2–614 is to salvage a deal when essentially full performance is possible in a commercially reasonable fashion, although not by the precise means agreed to by the parties." Wladis, *Impracticability As Risk Allocation: The Effect Of Changed Circumstances Upon Contract Obligations For The Sale Of Goods,* 22 Ga.L.Rev. 503, 538 (1988). We believe that the condition of the Kalli rendered Camden Iron's obligation to load the vessel "commercially impracticable" within the meaning of N.J.S.A. 12A:2–614,[27] because it was an extreme, unreasonable and severe deviation from foreseeable contingencies that arise with reasonable regularity in the maritime industry. Because the risks which parties ordinarily assume under an "FOBST" contract, *see supra,* were far exceeded, Camden Iron's performance under the strict letter of the November 13, 1986 contract was excused. The myriad terms contained in P–9 (*e.g.,* determining weight of cargo by scale weights, alteration of payment terms) were a good faith attempt by Camden Iron to effect a "substitute performance" through modification of the contract, which pursuant to N.J.S.A.

---

**26.** N.J.S.A. 12A:1–205(2) provides that:

A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it would be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

We are satisfied that the ability of a vessel to press up its tanks is a usage of trade in the maritime industry that occurs with such sufficient regularity that it "goes without saying" during the negotiation stages of a contract of sale. We therefore find that Camden Iron had a legitimate, justifiable expectation that the vessel supplied by Bomar would be able to, and would in fact, press its tanks. *See also* Restatement (Second) of Contracts § 222(1) (1981).

**27.** Although N.J.S.A. 12A:2–614, at first blush, seems to imply that the *only* acceptable "substi-

tute performance" is the tender of a "commercially reasonable substitute," we believe that purpose and logic underlying the Uniform Commercial Code demands a more liberal reading. Thus, whether Bomar had tendered a substitute vessel, or had accepted Camden Iron's contract modifications as "substitute performance" is of no material consequence. This reading is consonant with N.J.S.A. 12A:1–102, which declares the underlying purpose and policy of New Jersey's Uniform Commercial Code to be the simplification, clarification, and modernization of an expanding law governing commercial transactions. To this end, Comment one notes that the law which evolves under the statute is "to be developed by the courts in the light of unforeseen and new circumstances and practices." N.J.S.A. 12A:1–102 Comment 1.

12A:2–209, "needs no new consideration to be binding."[28]

Having concluded that the Kalli did not constitute "facilities reasonably suited to the delivery of the goods" and that Bomar rejected Camden Iron's good faith attempts to modify the contract, we find Bomar to have breached the November 13, 1986 contract. *See, e.g.,* J. White and R. Summers, *Uniform Commercial Code* § 3–7 at 140 (1988).

### 2. Bomar's Counterclaim That Camden Iron Unilaterally Breached The November 7, 1986 Contract

■ Bomar maintains that Camden Iron unilaterally breached a contract entered into on November 7, 1986 wherein Camden Iron was to sell 11,700 long tons of steel scrap to Bomar. (Count I of Counterclaim). The only evidence adduced at trial concerning Camden Iron's alleged breach of the November 7, 1986 contract was Mr. Lewis' testimony that as a response to Mr. Bantivoglio's "advice" that Camden Iron scrap could not be mixed with Northeast Export scrap, *see supra,* Bomar decided to increase its purchase from Camden Iron from the initial 11,700 long tons to 23,000. Mr. Lewis' sole testimony was as follows:

Q. .... Was that cargo lifted? The 11,700 tons?

A. No.

Q. Why not?

A. This particular portion of the contract was not lifted because John Bantivoglio on learning that we were loading the other half of the cargo from a competitor, he advised that he did not want to contribute to the cargo that would be loaded by that other party.

\* \* \* \* \* \*

Q. What did you do in response to Mr. Bantivoglio's advice that he would not load this cargo?

A. Well, we tried to negotiate—I tried to negotiate a way that we could work around that. The end result was that we chose to leave the half of cargo with Northeast Export and contract with Camden to load an entire cargo to cover this Hyundai contract.

Q. And was that subsequently confirmed by telex?

A. I believe it was, yes.

(T2 at 9, 10). This testimony alone fails to establish by a preponderance of the evidence that Camden Iron unilaterally breached the November 7, 1986 contract. If anything, it evidences little more than mere negotiation rather than any indicia of the existence of a bona fide contract. Such a reading is supported by the clear language of P–1, which Bomar drafted, which states that "THIS CANCELS AND SUPERCEDES OUR PREVIOUS TLX OF NOVEMBER 6, 1986." (P–1). Bomar has neither pleaded nor proved fraud, incapacity, economic duress or undue influence. As a result, we find for plaintiff on Count I of Bomar's Counterclaim.

### 3. Bomar's Counterclaim Concerning Damage To Its business Reputation

■ Bomar maintains that as a result of Camden Iron's intentional and malicious breaches of both the November 7, 1986 and November 13, 1986 contracts, Bomar's business reputation was damaged. (Count IV of Counterclaim). Having found that no November 7, 1986 contract exists, and that it was Bomar who breached the November 13, 1986 contract, the heart of Bomar's counterclaim on this theory is rendered nugatory.

Nevertheless, even if we were to assume, *arguendo,* that Camden Iron did breach both contracts as alleged, we would still be forced to reject this counterclaim because of defendant's failure to establish via testimony or exhibits the extent of damage, *if any,* suffered by Bomar as a result of the "breaches" at issue. Because Bomar has failed to address this theory of recovery with *any* offers of proof, only one result

---

**28.** The New Jersey Study Comment accompanying N.J.S.A. 12A:1–102 explains that only "good faith" modifications may be made in the absence of consideration, that is, as between merchants, only modifications with "some legitimate commercial reason" are effective. We believe that Camden Iron's good faith attempt to "salvage the deal," *see supra,* suffices as a proper business reason.

properly obtains. Consequently, we find for plaintiff on Count IV of defendant's counterclaim.

### B. *Damages*

■ On the issue of damages resulting from Bomar's breach of the November 13, 1986 contract, testimony was heard from Michael Buttil, who in December of 1986 served as Camden Iron's Comptroller. (T1 at 120–21). The mathematics of Mr. Buttil's calculations were memorialized in a memorandum prepared by Mr. Buttil, at the request of Camden Iron's counsel, for trial. (P–13). (T1 at 121–22). According to Mr. Buttil, as a result of Bomar's breach, Camden Iron suffered lost profit on the contract in the amount of $242,160.50 (T1 at 125). In addition to lost profits, Mr. Buttil added, Camden Iron was forced to bear an expense of $2,935.52, which sum represents "standby" stevedoring labor retained for December 15, 1986. (T1 at 125, 126). An invoice submitted by M.J. Rudolph to Camden Iron for $2,935.52 was introduced into evidence as exhibit P–14. Thus, with Camden Iron's overhead expenses taken into consideration, the sum of Camden Iron's prayer for damages totals $245,096.02. (T1 at 127). On cross examination, Bomar's only substantial objection to Mr. Buttil's calculations was that his figures were all premised on a steel scrap quantity of 23,000 long tons, while the November 13, 1986 contract provided for an "approximate" quantity of 23,000 long tons, given the acceptable deviation of plus or minus ten percent, at Bomar's option. (T1 at 129–30). (P–1).

N.J.S.A. 12A:2–703 provides a seller with four alternative damage remedies when a buyer revokes acceptance of goods or breaches prior to final acceptance: (1) an action for the price under N.J.S.A. 12A:2–709; (2) an action for the difference between the market price at the time and place for tender and unpaid contract price under N.J.S.A. 12A:2–708(1); (3) an action for the contract price minus the resale price under N.J.S.A. 12A:2–706; or (4) an action for the profit plus reasonable overhead under N.J.S.A. 12A:2–708(2). *See generally* Anderson, *A Roadmap For Seller's Damage Remedies Under The Uniform Commercial Code And Some Thoughts About Pleading And Proving Special Damages,* 19 Rutgers L.J. 245, 248 (1988). Although Camden Iron has not clearly articulated which of these remedies it has selected, because the remedies provided by New Jersey's Uniform Commercial Code are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed," N.J.S.A. 12A:1–106(1), we shall assume that Camden Iron has selected N.J.S.A. 12A:2–708.

N.J.S.A. 12A:2–708(2) provides, *inter alia,* that:

> the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages ..., due allowance for costs reasonably incurred and due credit for payments of proceeds of resale.

Bomar did not contest the essence of Camden Iron's calculation of damages in its statement of contested facts in the Joint Final Pre–Trial Order, *see* JFPTO at 9, nor did Bomar object, in a material way, to the reasonableness of Mr. Buttil's damage calculations at trial. Being satisfied that Camden Iron's figure of $245,096.02 accurately reflects its lost profit and reasonable overhead resulting from Bomar's breach, judgment shall be entered in that amount. *See, e.g., Vitex Mfg. Corp. v. Caribtex Corp.,* 377 F.2d 795 (3d Cir.1967) (applying Virgin Island's analogue of N.J.S.A. 12A:2–708(2)). We note that Bomar has not submitted any proofs or offered any testimony concerning its entitlement to "credit for payments or proceeds of resale" under N.J.S.A. 12A:2–708(2).

### III. CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of Camden Iron and against Bomar in the sum of $245,096.02.